IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) DENNIS R. CORNWELL, Individually, | ) | |
| and as Personal Representative of the Estate | ) | |
| of RENIA A. CORNWELL, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 08-CV-638-JHP-TLW |
| | ) | JUDGE JAMES H. PAYNE |
| (1) UNION PACIFIC RAILROAD CO., | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

JOHN M. MERRITT - OBA #6146
MERRITT & ASSOCIATES, P.C.
P.O. BOX 1377
OKLAHOMA CITY, OKLAHOMA  73101
(405) 236-2222    FAX:  (405) 232-8630
E-mail: docket.clerk@merrittfirm.com
ATTORNEY FOR PLAINTIFF

# TABLE OF CONTENTS

Page

RESPONSE TO STATEMENTS OF UNCONTROVERTED
MATERIAL FACT ........................................................ 1

    Facts Related to Plaintiff's Negligence Per Se ................................. 2

    Facts Related to Obstructions at the Crossing ................................ 3

    Facts Related to Train Speed ............................................. 4

    Facts Related to Locomotive Equipment ................................... 6

    Facts Relating to Need for Additional Warning Devices ...................... 8

    Facts Related to the Installation of Lights and Gates after
    the Collision at Issue .................................................... 8

PROPOSITIONS:

DEFENDANT IS LIABLE FOR THE INJURIES CAUSED BY ITS
FAILURE TO SOUND ITS WHISTLE (HORN) IMMEDIATELY
PRIOR TO THE SUBJECT CROSSING, OR TO STOP THE
TRAIN WHEN IT FIRST LEARNED THE WHISTLE ACTIVATION
SYSTEM AND/OR THE WHISTLE WAS INOPERABLE AND/OR
NON-COMPLIANT WITH FEDERAL REGULATIONS .......................... 8

DEFENDANT IS LIABLE FOR THE DAMAGES CAUSED BY
NEGLIGENTLY MAINTAINING AN OBSTRUCTION IN THE
SIGHT TRIANGLE FOR THIS CROSSING ................................... 14

AT THE TIME OF THE SUBJECT COLLISION, DEFENDANT
WAS OPERATING ITS TRAIN IN EXCESS OF THE LEGAL SPEED
LIMIT, THUS IS NEGLIGENT PER SE ..................................... 16

DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT
BASED UPON THE ALLEGED NEGLIGENCE OF
RENIA CORNWELL ..................................................... 20

SUMMARY JUDGMENT IS INAPPROPRIATE IN THIS CASE .................. 23

## **TABLE OF AUTHORITIES**

Page

CASE CITATIONS:

*Akin v. Missouri Pacific R.R.,*
1998 OK 102, 977 P.2d 1040 ............................................... **22**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242,106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ......................... **25**

*Associated Press v. United States,*
326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) ............................ **24**

*Bitler v. A. O. Smith Corp.,*
391 F.3d 1114 (10th Cir. 2004), *cert. denied sub nom.,*
*White-Rodgers v. Bitler,*
546 U.S. 926 (2005) ....................................................... **11**

*Bonner v. Polacari,*
350 F.2d 493 (10th Cir. 1965) ............................................. **5**

*Boyd v. National R.R. Passenger Corp.,*
446 Mass. 540, 845 N.E.2d 356 (Mass. 2006) ............................... **18**

*Boyles v. Oklahoma Natural Gas Company,*
1980 OK 163, 619 P.2d 613 ................................................ **21**

*Chicago, R.I. & P.R. Co. v. Hugh Breeding, Inc.,*
247 F.2d 217 (10th Cir. 1957) ............................................. **21**

*Chicago, R.I. & P.R. Co. v. McDougal,*
1953 OK 249, 262 P.2d 884 ................................................ **13**

*Continental Cas. Co. v. Shankel,*
88 F.2d 819 (10th Cir. 1937) .............................................. **21**

*CSX Transportation Inc. v. Easterwood,*
507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) ...................... **19**

*Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
494 F.2d 168 (10th Cir. 1974) ............................................. **25**

*F.D.I.C. v. Ferguson,*
982 F.2d 404 (10th Cir. 1991) ............................................. **21**

*Fidelity and Casualty Co. of New York v. Hendrix*,
1968 OK 53, 440 P.2d 735 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

*Graham v. Keuchel*,
1993 OK 6, 847 P.2d 342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Hamilton v. Allen*,
1993 OK 46, 852 P.2d 697 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21,22**

*Harman v. Diversified Medical Investments Corporation*,
488 F.2d 111 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*Jester v. St. Louis-San Francisco Ry. Co.*,
1965 OK 180, 413 P.2d 539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Jones v. Nelson*,
484 F.2d 1165 (10th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*Jones v. Oklahoma Natural Gas Co.*,
1994 OK 89, 894 P.2d 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Kansas City Southern Ry. Co. v. Martin*,
1956 OK 47, 293 P.2d 600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

*Kansas, O. & G. Ry. Co. v. Clark*,
1953 OK 276, 262 P.2d 426 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

*Maben v. Lee*,
1953 OK 139, 260 P.2d 1064 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

*Madison v. Deseret Livestock Co.*,
574 F.2d 1027 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

*Midland Val. R. Co. v. Pettie*,
1945 OK 259, 196 Okla. 52, 162 P.2d 543 . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Missouri-Kansas-Texas R. Co. v. Baird*,
1962 OK 82, 372 P.2d 847 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13,22**

*Missouri, K. & T. R. Co. v. Caster*,
1965 OK 10, 410 P.2d 67 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

*Missouri-Kansas Texas Railroad Co. v. Chief Equipment Co.*,
1966 OK 227, 421 P.2d 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13,14**

*Mitchell v. Gencorp, Inc.,*
165 F.3d 778 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

*Mitchell v. Pilgrim Holiness Church Corp.,*
210 F.2d 879 (7th Cir.), *cert. denied*, 347 U.S. 1013 (1954) . . . . . . . . . . . . . . . . . . . . **24**

*Murrell v. Union Pacific R. Co.,*
544 F.Supp.2d 1138 (D. Or. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18,19**

*Nash v. Hiller,*
1965 OK 22, 398 P.2d 817 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**5**

*Poller v. Columbia Broadcasting System, Inc.,*
368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) . . . . . . . . . . . . . . . . . . . . . . . . **24**

*Public Service Co. of Oklahoma v. Fort Worth Grain Exchange,*
1998 OK 89, 988 P.2d 323 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Smith v. Cox,*
1956 OK 241, 301 P.2d 649 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Smoot v. Chicago, Rock Island and Pacific Railroad Company,*
378 F.2d 879 (10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*St. Louis-San Francisco Ry. Co. v. Pufahl,*
1935 OK 614, 45 P.2d 729 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

*St. Louis-San Francisco Ry. Co. v. Rundell,*
1925 OK 183, 108 Okla. 132, 235 P. 491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Stewart v. South Kansas and Oklahoma R.R., Inc.,*
36 F.Supp.2d 919 (D. Kan. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County,*
546 F.3d 1299 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*United States v. Diebold, Inc.,*
369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) . . . . . . . . . . . . . . . . . . . . . . . . **25**

*Walker v. St. Louis-San Francisco Ry. Co.,*
1982 OK 25, 646 P.2d 593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13,14**

*Warrior Tombigbee Transportation Co., Inc. v. M/V Nan Fung,*
695 F.2d 1294 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

*Webb v. Allstate Life Ins. Co.,*
536 F.2d 336 (10th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

FEDERAL RULES OF CIVIL PROCEDURES:

Fed.R.Civ.P. Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

U.S. CODE:

49 U.S.C. § 20701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

CODE OF FEDERAL REGULATIONS:

49 CFR §213.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4,16,18,20**

49 CFR §222.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

49 CFR §229.117 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5,18**

49 C.F.R. § 229.117(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18,19**

49 C.F.R. § 229.117(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

49 CFR §229.129 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6,11**

49 CFR §229.21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

CONSTITUTION:

Okla. Const. art. 23, § 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20,21**

STATUTES:

23 O.S. § 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20,21**

47 O.S. § 11-403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

47 O.S. § 11-701(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

66 O.S. § 126 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8,13**

OKLAHOMA ADMINISTRATIVE CODE:

OAC 165:32-1-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

OAC 165:32-1-11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

COMES NOW the Plaintiff and offers this Response to the Defendant's Motion for Summary Judgment. Initially, Plaintiff would show that he will not pursue claims for inadequate signals (lights, bells and gates) at the subject crossing and will not pursue claims for the "negligent delay" of the installation of lights, bells and gates at the subject crossing, thus the Defendant's motion for summary judgment on these claims has been rendered moot. Plaintiff will pursue claims based upon: (1) Defendant's negligent failure to properly sound its horn (whistle) prior to the crossing where the subject collision occurred, or failure to stop the locomotive when it would have first been noticed that the whistle activation system or whistle was inoperable and/or compliant with federal regulations; (2) Defendant's negligent maintenance of an obstruction within the sight triangle at the subject railroad crossing, which prevented motorist such as Renia Cornwell, deceased, from viewing an on-coming train; and (3) Defendant's violation of the maximum speed limit set by federal law. Plaintiff offers the following arguments and authorities which support Plaintiff's position that the Defendant's motion for summary judgment should be overruled.

### RESPONSE TO STATEMENTS OF UNCONTROVERTED MATERIAL FACT

1.  On July 16, 2008, a Chevrolet Blazer driven by Renia A. Cornwell collided with a locomotive owned and operated by Union Pacific. The collision occurred at the East Flint Street crossing in Vinita, Oklahoma. *See* Complaint filed herein on September 19, 2008. *See* also Official Oklahoma Traffic Collision Report attached hereto as Exhibit 1.

**Plaintiff's Response**: Denied. The Union Pacific locomotive collided with the vehicle driven by Renia A. Cornwell. (*See* the CD-ROM containing the video from the locomotive's Data Event Recorder, which was produced by Defendant under protective order and was filed by Plaintiff under seal on November 20, 2009. This CD-ROM was Exhibit "2" to the Declaration of Michael Keane, P.E. attached to Plaintiff's Reply to the Defendant's Response to the Plaintiff's Motion to Compel [Doc. #55]. *See* the February 2, 2010 docket entry [Doc. #106] regarding the sealed

document.)

2. At the time of the collision, the crossing was protected by advanced warning posts and reflectorized crossbucks. See photographs of crossing, attached as Exhibit 2.

**Plaintiff's Response**: Admitted.

### Facts Related to Plaintiff's Negligence Per Se

3. Okla. Stat. Tit 42, (*sic*) § 11-701(A) states that a driver must stop at a grade crossing for a train that is immediately approaching.

**Plaintiff's Response**: It is denied that such statute exists. It is assumed that Defendant was attempting to refer to 47 O.S. § 11-701(A). It is denied that Defendant has made an accurate statement of this statute as the statute prescribes conditions under which motorists must make such stop and such conditions were not met in the case of Renia Cornwell's approach and attempt to cross the railroad crossing.

4. Okla.Stat. Tit 42, (*sic*) § 11-403 provides the circumstances under which a driver must yield a right-of-way to another vehicle. `

**Plaintiff's Response**: It is denied that such statute exists. It is assumed that Defendant was attempting to refer to 47 O.S. § 11-403. It is admitted as it relates to another motor vehicle, but denied as it relates to a train, or a railroad crossing.

5. Plaintiff was cited by the Vinita Police Department for a violation of § 11-403 due to her failure to yield to the oncoming train. *See* Vinita Police Department Incident Report, attached as Exhibit 3.

**Plaintiff's Response**: Admitted.

6. The charges brought against Plaintiff for her failure to yield were cleared due to the death of Plaintiff. *Id.*

**Plaintiff's Response**: Denied.

7. The Official Oklahoma Traffic Collision Report states that Plaintiff failed to yield to the train. *See* Exhibit 1.

**Plaintiff's Response**: Admitted.

8.   The video from the lead locomotive shows that Plaintiff failed to yield or take any evasive action to prevent the collision. *See* Train Image Recorder, submitted to the Court under seal as Exhibit 4.

**Plaintiff's Response**: Denied.  The Plaintiff's vehicle accelerated to avoid the collision.

### Facts Related to Obstructions at the Crossing

9.   The Oklahoma Corporation Commission has defined a "sight triangle" at a railroad crossing as a triangle which has a beginning point from the center of the main track and the center point of the grade crossing extending along the center of the street or roadway for a distance of 50 feet, then extending at an angle until arriving at a point on the center of the main track 250 feet from the original beginning point. *See* OAC 165:32-1-3.

**Plaintiff's Response**: Admitted.

10.   The Oklahoma Corporation Commission has promulgated rules under which a railroad has a duty to reasonably abate trees, shrubs and other obstructions within the sight triangle. *See* OAC 165:32-1-11(b).

**Plaintiff's Response**: Admitted.

11.   Union Pacific maintained a sight triangle in excess of its duty under OAC rules, as Union Pacific maintained a sight triangle at this crossing whose dimensions were 50 feet from the center point of the grade crossing extending down the roadway, then extending along the property line 300 feet in either direction from the beginning point. *See* Photographs of crossing, attached as Exhibit 5.

**Plaintiff's Response**: Denied.

12.   A signal box and some maintenance and construction equipment were present within the sight triangle. *See* Exhibit 5.

**Plaintiff's Response**: Admitted.

13.   Under the regulations promulgated by the Oklahoma Corporation Commission, devices, signs and structures necessary for the operation of the railroad are not considered obstructions. *See* OAC 165:32-1-11(b).

**Plaintiff's Response**:  It is admitted that the statute so states, however, it is denied that the

"signal box" or "signal house", which Defendant maintained within the "sight triangle" was, at the

time of the subject collision, "necessary" for the operation of the railroad. (Declaration of Allen W.

Haley, Jr., ¶¶ 2-4, **Exh. "1".**) The maintenance of the signal house within the sight triangle of this

crossing was an obstruction which blocked the view of motorists approaching the crossing, such as

Renia Cornwell, from seeing an on-coming train, and was a contributing proximate cause of the

subject collision and death of Mrs. Cornwell. *Id.*

**Facts Related to Train Speed**

14.   The Federal Railroad Administration ("FRA") has classified the railroad track
located at this crossing as Class 3 track. *See* Affidavit of Tom Cooper, attached
hereto as Exhibit 6.

**Plaintiff's Response**:  Admitted.

15.   The speed limit for Class 3 tracks set by the FRA is 40 mph for freight trains
and 60 mph for passenger trains. *See* 49 C.F.R. § 213.9.

**Plaintiff's Response**:  Admitted.

16.   The Vinita Police Department Incident Report shows the locomotive's speed at
the time of the collision as 37 mph. *See* Exhibit 3.

**Plaintiff's Response**:   Admitted that it so states in the report, but denied that it is the

accurate speed of the train at the time of the collision.  The police officer who put this in the report

had no personal knowledge of the speed of the locomotive.  The officer made no calculations to

determine the actual speed of the locomotive at the time of the collision.  The officer simply wrote

down that he spoke to Tad Daigle, the conductor of the train, and that "Daigle advised that when they

were approaching the Flint St. Crossing he had looked down to observe the speed of the train which

he noted was approximately 37 MPH." (*See* p. 6 to Exhibit 3 to Defendant's motion for summary

judgment.) Obviously, any such alleged conversation regarding the alleged speed of the train at the

time of the collision is hearsay and inadmissible, thus may not be relied upon by Defendant in

-4-

support of its motion for summary judgment.[1] In fact, the statements in the Vinita Police Department incident report are flatly disputed by the sworn deposition testimony given by train conductor, Tad Daigle, wherein Mr. Daigle testified he doesn't know if he looked at the speedometer of the train near the time of the collision; he doesn't know how close to the accident he last looked at the speedometer; and he doesn't know how fast he was going at the time of the collision or immediately prior to the collision. (Depo. of Tad Daigle, p. 10, line 20 - p. 11, line 4, **Exh. "2"**.)

17.  The speed indicator on locomotives is allowed as an accuracy variance of +/-3 mph for trains traveling 30 mph and +/-5 mph for trains traveling 40 mph. *See* 49 C.F.R. § 229.117; and Deposition of Mark Polan, 83:10-19, attached as Exhibit 7.

**Plaintiff's Response**: Admitted. While the regulation permits a variance in the train speed indicator, it does not allow the Defendant to operate its trains in excess of the maximum federal speed limit.

18.  Data downloaded from the lead locomotive (8130), the second locomotive (5908), and the third locomotive (5910) indicate that at the time of the collision, these locomotives were traveling at speeds of 42 mph, 40 mph and 40 mph, respectively. *See* Data Event Recorder printout, attached as Exhibit 8.

---

[1] The Tenth Circuit Court of Appeals held that opinion testimony of the investigating officer, which is based upon hearsay, is inadmissible. "Certainly, when a police officer's testimony about an accident does go to the ultimate issue for the jury or is based on hearsay, it should not be received." *Bonner v. Polacari*, 350 F.2d 493, 496 (10th Cir. 1965) (footnotes omitted). The Tenth Circuit relied upon *Nash v. Hiller*, 1965 OK 22, 398 P.2d 817, which held that a "highway patrolman's testimony . . . was inadmissible, because it was based on hearsay" and "(w)e determine that the eliciting of the opinion testimony of the highway patrolman, based entirely on hearsay and in no degree upon physical facts . . . extended beyond the limits of permissible inquiry." *See also*: *Fidelity and Casualty Co. of New York v. Hendrix*, 1968 OK 53, 440 P.2d 735, 737 ("Further, the patrolman repeatedly testified, over objection, that his opinion as to the speed of the bus was partially based upon what defendant herein calls hearsay evidence, *i.e.*, his conversation with the bus driver. We have previously held that an expert opinion based at least partly on hearsay is inadmissible."); *Maben v. Lee*, 1953 OK 139, 260 P.2d 1064, 1067, wherein the Court held that reversible error was created by introduction of "testimony by a highway patrolman who, upon the basis of his investigation, physical surroundings, coupled with hearsay information secured from third parties after the accident, attempts by his testimony to decide the issue of negligence by stating unequivocally that the accident occurred as a result of the defendant's acts." 260 P.2d at 1068.

**Plaintiff's Response**: Admitted that the data so states. Denied that this data is accurate. (Declaration of Allen Haley, Jr., ¶¶9-11, **Exh. "1".**) Even Defendant's own records show the Defendant's train was exceeding the 40 miles per hour maximum speed limit set by federal law for trains at the crossing where the subject collision occurred. *Id.* at ¶9. Plaintiff's expert calculates the speed of the locomotive to be 47 miles per hour at the time of the collision. *Id.* at ¶10. Operation of Defendant's train in excess of the maximum authorized speed for trains on this track at this location was a contributing proximate cause of this collision and resulting death of Mrs. Cornwell. *Id.* at ¶11. Defendant's violation of the maximum federal speed limit was a willful violation and demonstrates reckless indifference to the safety of the public who used or would use this crossing on the approach of this train and was life-threatening. *Id.*

### Facts Related to Locomotive Equipment

19.    The lead locomotive was numbered UP 8130. Union Pacific outfitted locomotive 8130 with a LESLIE RSL-3L-RF horn and twin, sealed beam, 32V, 200W headlights, all of which conform to the regulations set forth in federal regulations. *See* Affidavit of Tommy Wilkinson, attached as Exhibit 9.

**Plaintiff's Response**: Admitted to the extent that such locomotive did contain the equipment enumerated in such statement. Denied to the extent such statement suggests the train's whistle complied with federal regulation 49 C.F.R. §229.129, which requires the locomotive horn to produce a minimum sound level of 96dB(A) and a maximum sound level of 110 dB(A) at 100 feet forward of the locomotive in its direction of travel. The evidence in the case directs the jury to infer either: (1) the engineer did not activate the whistle, or (2) the whistle activation system or whistle was not operable and/or (3) that if the whistle was operable and activated, it did not produce the minimum sound level required by the regulation. (Declaration of Allen Haley, Jr., ¶¶5-8, **Exh. "1".**) Anyone of the above scenarios would constitute negligence and a breach of generally recognized and accepted customs and practices and violation of federal or state law as set out elsewhere herein. *Id.*

20.   The data event recorder on locomotive 8130 shows that the horn was blown prior to the collision. *See* Exhibit 8.

**Plaintiff's Response**:  It is admitted that the data event recorder so shows, but it is denied that the horn was, in fact, blown prior to the intersection as required by law.  (Declaration of Allen Haley, Jr., ¶¶5-8, **Exh. "1"**. Declarations of Allen W. Haley, Jr., dated October 6, 2009, **Exh. "3"**, and dated November 13, 2009, **Exh. "4"**.  Declaration of Michael Keane, P.E., **Exh. "5"**. Declaration of Daniel A. Joseph, Ph.D., **Exh. "6"**.  Depo. of Steve Allen Showalter, **Exh. "7"**. Depo. of Jack Johnson, **Exh. "8"**.  Declaration of Dennis Cornwell, **Exh. "9"**.  *See also*: the CD-ROM containing the video from the locomotive's Data Event Recorder, which was produced by Defendant under protective order and was filed by Plaintiff under seal on November 20, 2009, February 2, 2010 docket entry [Doc. #106]. )

21.   The engineer and the conductor both testified that the horn was blown prior to the collision. *See* Deposition of Ted Daigle, 15:4 - 16:18, attached as Exhibit 10, and Deposition of Steve Morris, 9:17 - 10:12, attached as Exhibit 11.

**Plaintiff's Response**:  Admitted that the witnesses so testified, but denied that the horn was blown prior to the collision as required by law.  (*See* response to #20, above.)

22.   Witnesses in close proximity of the collision heard the horn blow prior to the collision. *See* Affidavit of Garry Sheckels, attached as Exhibit 12; Affidavit of Karen Davis, attached as Exhibit 13; Deposition of Owen Goss taken January 20, 2010 (transcript currently unavailable; Union Pacific will supplement upon receipt); Deposition of James Wilson taken January 20, 2010 (transcript currently unavailable Union Pacific will supplement upon receipt); Deposition of Terry Pope taken January 21, 2010 (transcript currently unavailable; Union Pacific will supplement upon receipt; and Deposition of Toby McCabe taken January 21, 2010 (transcript currently unavailable; Union Pacific will supplement upon receipt).

**Plaintiff's Response**:  Denied that such witnesses heard such horn so sound, but admitted they so testified.  Other witnesses state that the Defendant's train did not sound its horn at or prior to the time of the collision with Mrs. Cornwell's, which is a violation of Oklahoma law and constitutes negligence per se. (*See* response to #20, above.)  It is a question of fact as to whether the

whistle (horn) sounded.

Defendant's **"Facts Relating to Need for Additional Warning Devices"** (Nos. 23-29) are admitted and **"Facts Related to the Installation of Lights and Gates after the Collision at Issue"** (Nos. 30- 33) are admitted, but have no relevance to the Plaintiff's claims being pursued in this case.

<u>**DEFENDANT IS LIABLE FOR THE INJURIES CAUSED BY ITS FAILURE TO SOUND ITS WHISTLE (HORN) IMMEDIATELY PRIOR TO THE SUBJECT CROSSING, OR TO STOP THE TRAIN WHEN IT FIRST LEARNED THE WHISTLE ACTIVATION SYSTEM AND/OR THE WHISTLE WAS INOPERABLE AND/OR NON-COMPLIANT WITH FEDERAL REGULATIONS**</u>

One of Plaintiff's claims in this case is that the Defendant "failed to sound its train's horn as it approached the railroad crossing or failed to sound its horn within the required distance from the intersection." (Complaint, ¶ 19(d) [Doc. #1].)

The locomotive horn or whistle must be sounded when the locomotive is approaching crossings in compliance with 49 C.F.R. 222.21 and 66 O.S. 126. It is clearly the law that railroad carriers may only operate trains that "are in proper condition and safe to operate without unnecessary danger of personal injury" and have been inspected. 49 U.S.C. § 20701. A daily inspection is required for locomotives pursuant to 49 C.F.R. 229.21. During such inspections, it must be ensured that all equipment on such locomotive is in compliance and in proper repair and this would include the horn (whistle) on a locomotive. (Declaration of Allen W. Haley, Jr., ¶8, **Exh. "1"**.)

The Defendant has produced a video[2], with both visual and audio recordings, which depicts the locomotive traveling across a number of railroad crossings prior to crossing the railroad crossing where the locomotive struck the vehicle driven by Plaintiff's Decedent. Upon viewing the videotape with sound, Plaintiff's railroad expert, Allen W. Haley, Jr., is able to hear the crash of the subject accident and the wheels of the train rolling on the tracks, but is unable to hear a train whistle

---

[2] The videotape is the subject of a Protective Order and has been filed under seal. [Doc. #106].

sounding at any time the locomotive and train approaches a railroad crossing, including the crossing where the subject accident occurred. (Declarations of Allen W. Haley, Jr., dated October 6, 2009, **Exh. "3"**, and dated November 13, 2009, **Exh. "4".**)

It is clear from the Declaration of Michael Keane, an acoustical engineer who has analyzed the sound portion of the video from locomotive UP 8130 which was the lead engine of the train which is the subject of this action, that the whistle (horn) did not sound on the locomotive at any time prior to the collision which is the subject of this action. (Declaration of Michael Keane, P.E., **Exh. "5".**)   Mr. Keane analyzed the sound portion of the video with a computer sound analysis program which permits him to see the waveforms for every frequency on the sound portion of the video. (**Exh. "5".**)   From this analysis, as explained in Mr. Keane's declaration (**Exh. "5".**), Mr. Keane is able to determine that there was no microphone "saturation" as alleged by defense expert Michael Fann and no masking of the whistle (horn) as suggested by such defense expert. Mr. Keane clearly states that if the whistle (horn) had been sounded, it would have been clearly heard on the audio portion of the video. (**Exh. "5".**)

Mr. Keane, Plaintiff's acoustical engineer not only analyzed the video sound from locomotive UP 8130, the subject locomotive, but also downloaded from Union Pacific's web site a video from a Union Pacific locomotive which recorded sound while the Union Pacific locomotive was operating, moving down a track, and sounding its whistle. (*See* Exh. "4", which was previously filed conventionally herein on November 20, 2009 [Doc. # 70]) to the Declaration of Michael Keane, **Exh. "5".**)   The video recorder and event recorder from that locomotive was similar equipment as the equipment on locomotive UP 8130.   *Id.*   This provided additional information to Plaintiff's acoustical engineer of what the frequencies waveform's look like on the computer analysis from an operating train where the whistle (horn) is sounded.   (**Exh. "5".**)

Furthermore, railroads can and do manipulate the data from its event data recorders; a fact that was confirmed by a Union Pacific employee responsible for event recorder analysis and interpretation. (Declaration of Allen W. Haley, dated November 13, 2009, ¶5, **Exh. "4".**) This point is underscored by the Declaration of Plaintiff's software systems expert, Daniel A. Joseph, Ph.D., regarding the ability to alter any data that was downloaded from the event recorder aboard the subject locomotive. (Declaration of Daniel A. Joseph, Ph.D., **Exh. "6".**)

There are witnesses who have been deposed in this case, who have stated that the Defendant's train did not sound its horn (whistle) immediately prior to the crossing where the subject collision occurred. Steve Showalter was approximately one block away from the collision site and he states that he did not hear the train sound its horn prior to the subject intersection where the collision occurred. (Depo. of Steve Allen Showalter, p. 11, lines 2 - p. 12, line 13; p. 23, lines 10-12, **Exh. "7".**) Mr. Showalter confirms that if the train would have sounded its horn immediately prior to the subject crossing, then he would have been able to hear it. *Id.* Mr. Showalter confirms that he heard the train coming into town, but the train did not blow its whistle until after it hit Mrs. Cornwell's car. (Depo. of Steve Allen Showalter, p. 28, line 23 - p. 29, line 25, **Exh. "7".**) Mr. Showalter is positive that the train did not blow its horn at the intersection where the subject collision occurred. (Depo. of Steve Allen Showalter, p. 13, lines 11-24, **Exh. "7".**) Mr. Showalter testified that he did not hear the train's horn sound until after he heard the train collide with Mrs. Cornwell's vehicle. (Depo. of Steve Allen Showalter, p. 19, lines 13-15; p. 21, lines 1-11, **Exh. "7".**)

Mr. Jack Johnson, who is the Water Superintendent for the City of Vinita, was also about ½ a block away from the site of the collision. (Depo. of Jack Johnson, p. 7, line 2 - p. 8, line 13; p. 9, line 20 - p. 10, line 2, **Exh. "8".**) Mr. Johnson did not hear the train blow its whistle prior to the

collision with Mrs. Cornwell's vehicle. (Depo. of Jack Johnson, p. 7, lines 3-23, **Exh. "8".**) Mr.

Johnson confirms that if the horn blew prior to the subject crossing, he would have been in a position

to hear it. (Depo. of Jack Johnson, p. 8, lines 4-13; p. 9, lines 20-25, **Exh. "8".**) Mr. Johnson also

testified that he did not hear the train sound its horn at any of the intersections it crossed prior to the

Flint street intersection where the subject collision occurred. (Depo. of Jack Johnson, p. 11, lines

3-6, **Exh. "8".**)

Dennis Cornwell, the decedent's surviving husband, testified that at the time of the subject

collision, he was approximately 2 miles away at his home working outside on his semi-tractor.

(Declaration of Dennis Cornwell, **Exh. "9".**) Mr. Cornwell heard a screeching noise in the direction

of the collision site which sounded like the application of train brakes. *Id.* Mr. Cornwell then heard

an impact between the train and another vehicle (which he later learned was his wife's vehicle) and

then he heard the vehicle impacting and crashing along the ground. *Id.* Although he was in a

position to hear both the screeching brakes of the train and the collision impact and the crash of the

vehicle along the ground, at no time prior thereto did Mr. Cornwell hear the train sound its horn or

whistle. *Id.*

The evidence in this case establishes: (1) the engineer did not activate the whistle; or (2) the

whistle activation system or whistle was not operable; and/or (3) that if the whistle and whistle

activation system was operable and activated, the whistle did not produce the minimum sound level

required by the federal regulation, 49 C.F.R. § 229.129.[3] (Declaration of Allen W. Haley, Jr., ¶5,

---

[3] "The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community. Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on acts which sufficiently satisfy Rule 702's reliability requirements." *Bitler v. A. O. Smith Corp.*, 391 F.3d 1114, 1120 (10th Cir. 2004), *cert. denied sub nom.*, *White-Rodgers v. Bitler*, 546 U.S. 926 (2005), *quoting Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). The expert need only employ "a process of **reasoning to the best inference.**" 391 F.3d at 1124.

Exh. "1".)

The audio portion of the video recording aboard the subject locomotive reveals that the train whistle did not sound as required by state and federal law as the train crossed numerous crossings prior to reaching the subject crossing where the subject collision occurred. *Id.* at ¶6. Therefore the train crew should have been aware that either: (1) the engineer did not activate the whistle at a number of crossings before reaching the subject crossing and did not activate the whistle at the subject crossing, or (2) the whistle activation system or whistle was not operable when the train crossed numerous crossings before the subject crossing, and/or (3) that if the whistle activation system and whistle were operable and activated, the whistle did not produce the minimum sound level required by Federal regulations, as the train crossed numerous crossings prior to reaching the subject crossing where the collision occurred. *Id.* If the train whistle was not sounding due to malfunction of any equipment, including the whistle, this knowledge would have required the train crew to have stopped the train immediately and to have made arrangements for the whistle activation and/or whistle equipment to have been immediately repaired before the locomotive, which was the subject of the collision, proceeded. *Id.* Failure to have ceased operation of such locomotive while such whistle activation equipment and/or whistle was malfunctioning constituted a breach of the generally recognized and accepted customary and usual practices and violation of Federal and State law set out more specifically elsewhere herein. *Id.*

Proceeding in the face of a malfunction and/or not in compliance with Federal regulations is clearly reckless disregard and conscious indifference for the lives and safety of others and would be life threatening. *Id.* at ¶7. If the whistle and the whistle activation equipment was operable, yet the engineer failed to activate the whistle over numerous crossings prior to the subject crossing, then the engineer was intentionally violating Federal and State law as set out elsewhere herein and

intentionally endangering the lives and safety of others, and intentionally acting with conscious indifference for the lives and safety of others. *Id.*

Under Oklahoma law a locomotive must sound a warning bell or whistle at a distance of at least eighty rods (one-quarter of a mile, 440 yards, 1320 feet) from the place where the railroad crosses any other road or street. 66 O.S § 126; *Walker v. St. Louis-San Francisco Rv. Co.*, 1982 OK 25, 646 P.2d 593, 597. This statute "is intended rather to prescribe the *minimum* of care which must be observed in all cases." *St. Louis-San Francisco Ry. Co. v. Pufahl*, 1935 OK 614, 45 P.2d 729, 732. Title 66 O.S. § 126 also provides that the railroad is "liable for all damages which shall be sustained by any person" by reason of the locomotive's failure to properly sound such bell or whistle.[4] In *Walker v. St.-Louis-San Francisco Ry. Co.*, *supra*, the Court stated "(a)s a general rule, whether a proper warning is given is a question for the jury as long as the evidence permits several inferences". 646 P.2d at 597. The Court concluded that where there is conflicting evidence showing "that the railway breached its duty to sound a warning upon approach of the crossing, and, as a result, plaintiff sustained injury", the issue is properly submitted to the jury to decide. *Id.*[5]

The Supreme Court of Oklahoma has stated in order for a Plaintiff to sustain the burden that

---

[4] *See also*: *Missouri-Kansas-Texas R. Co. v. Baird*, 1962 OK 82, 372 P.2d 847, Syllabus 1 ("Where evidence tends to show that motorist was without knowledge of approaching train in time to avoid colliding with it at crossing, failure of operators of train to sound warning as in 66 O.S.1961 § 126 provided, may be found to be proximate cause of collision and resulting damages.").

[5] *See also*: *Missouri-Kansas Texas Railroad Co. v. Chief Equipment Co.*, 1966 OK 227, 421 P.2d 841, 843 ("The evidence with reference to whether the whistle or bell of the train was sounded as the train approached the crossing is in conflict", therefore "the question of proximate cause is for the jury where there is competent evidence showing that a warning was not given."); *Chicago, R.I. & P.R. Co. v. McDougal*, 1953 OK 249, 262 P.2d 884, 886 ("A railway company is charged with the duty of . . . giving warning by whistle or bell when approaching highway crossings, 66 O.S.1951 § 126; and, under conflicting evidence on the issue of whether the negligence of the railroad company in failing to do as charged, or the negligence of the plaintiff in failing to look and listen before driving onto defendant's truck was a question for the jury. . .").

a bell or whistle was not sounded, Plaintiff need only show that a witness was in a position to hear and was giving special attention to the matter.[6] The Court in *Missouri-Kansas-Texas Railroad Co. v. Chief Equipment Co.*, *supra*, held that Plaintiff met his burden of proof by merely demonstrating that one of Plaintiff's witnesses, who was approximately 100 yards away from the accident heard the accident but not the train whistle or the bell and another witness who did not hear a whistle or bell as the train approached the crossing. 421 P.2d at 843. In *Kansas, O & G Ry. v. Clark*, *supra*, the Plaintiff and his passenger testified that they heard no train whistle or bell, nor other train noise prior to the accident. Other witnesses also testified that "they did not hear a whistle or bell of the approaching train." 262 P.2d at 428. The Supreme Court of Oklahoma held that such testimony was sufficient to present a question of fact for the jury to decide whether or not the railroad sounded its bell or whistle prior to the collision. *Id.* at 429.

### DEFENDANT IS LIABLE FOR THE DAMAGES CAUSED BY NEGLIGENTLY MAINTAINING AN OBSTRUCTION IN THE SIGHT TRIANGLE FOR THIS CROSSING

As admitted by the Defendant, the rules of the Oklahoma Corporation Commission requires the Defendant to maintain a proper sight triangle at the subject railroad crossing and to abate obstructions within the sight triangle. (*See* Defendant's Facts, Nos. 9 and 10.) The Defendant's signal house[7] (which Defendant describes as a "signal box"), which was present at the subject railroad crossing and which constituted an obstruction within the sight triangle required by OAC 165:32-1-3 and 165:32-1-11(b), limited the vision of a motorist, such as Mrs. Cornwell, of the oncoming subject train and was **not**, at the time of the subject accident, "necessary" for the operation

---

[6]   *Walker v. St. Louis-San Francisco Ry. Co.*,1982 OK 25, 646 P.2d 593, 597-8; *Missouri-Kansas-Texas Railroad Co. v. Chief Equipment Co.*, 1966 OK 227, 421 P.2d 841, 843; *Kansas, O & G Ry. v. Clark*, 1953 OK 276, 262 P.2d 426, 428.

[7]   A picture of the Defendant's signal house that is within the sight triangle is attached as **Exh. "10"**.

of the railroad and railroad equipment. (Declaration of Allen Haley, Jr., ¶2, **Exh. "1".**)  This is so because the signal house served no necessary purpose other than to operate lights and gates at a crossing.  *Id.*  At the time of the subject accident, there were no lights or gates installed at the subject crossing.  *Id.*  Therefore, the signal house, which was installed inside the sight triangle, obstructed Mrs. Cornwell's view of the oncoming train, yet Mrs. Cornwell did not have the benefit of the protection of the lights and gates as they had not yet been installed.  *Id.*  Such signal house would have been necessary equipment, only if and when such gates and lights were installed, and thereafter such signal house had been installed within the sight triangle.  *Id.*

The Defendant should have and could have installed the signal house at the subject railroad crossing *after* the lights and gates had been first installed.  *Id.* at ¶3. The Defendant should have and could have connected the signal house to the lights and gates and to the power source after the lights and gates had been installed and, while doing so, provided a flagman to warn approaching motorists of the presence of a train approaching the crossing to compensate for the obstruction to view caused by the location of the signal house.  *Id.*  This installation of the signal house should have been able to have been accomplished within a day's period of time barring any unforeseen circumstances. *Id.* The signal house clearly should not have been installed prior to the lights and gates being in place and ready for connection to such signal house and power source and capable of immediately providing protection of motorists whose vision would be obstructed of an approaching train by the signal house.  *Id.* at ¶4.  Also, such signal house could also have been installed in an area which would not have blocked the sight triangle.  *Id.*

The question of whether or not Defendant's maintenance of an obstruction within the sight triangle was a contributing proximate cause of the collision is a question of fact for the jury to

decide.[8]

## AT THE TIME OF THE SUBJECT COLLISION, DEFENDANT WAS OPERATING ITS TRAIN IN EXCESS OF THE LEGAL SPEED LIMIT, THUS IS NEGLIGENT PER SE

The Defendant's train was exceeding the maximum authorized speed for trains at the crossing where the subject collision occurred, which is set forth in the speed limit tables in 49 C.F.R. § 213.9. (Declaration of Allen W. Haley, ¶9, **Exh. "1"**.) The event recorder from the lead locomotive (UP 8130) shows that it was being operated at a speed of forty-two (42) m.p.h. at the time of the subject impact and had been operating at this speed for a period of time of approximately seventy-three (73) seconds. *Id.* Under 49 C.F.R. § 213.9, the maximum speed for freight trains at this location is forty (40) m.p.h., not forty-two (42) m.p.h. as the train's event recorder shows it was being operated, thus according to Defendant's own records, the train's speed exceeded the maximum speed authorized by federal law. *Id.*

Plaintiff's train expert, Allen Haley, has reviewed the event recorder data produced by the Defendant and compared it to the visual information contained in the track image recorder ("TIR") to determine the stopping point of the locomotive. *Id.* at ¶10. In an analysis of the video information on the TIR, it is easily determined by counting the number of frames between the two events that the locomotive moved for 835 frames or approximately 56 seconds after the impact with Mrs. Cornwell's vehicle at East Flint Street. *Id.* It is also visible in the TIR video that the locomotive

---

[8] *See, e.g.*, ***Missouri, K. & T. R. Co. v. Caster***, 1965 OK 10, 410 P.2d 67, 69 ("We hold that the above noted evidence was sufficient to raise a question for jury determination as to whether the defendant railroad company had negligently maintained the crossing in such a way as to permit the visibility of motorists to become obstructed."); ***Kansas City Southern Ry. Co. v. Martin***, 1956 OK 47, 293 P.2d 600, 602 ("There was ample testimony to establish the defendant's primary negligence in the maintenance of the crossing and in permitting obstructions to block the view of approaching trains. The evidence shows that this negligence placed the plaintiff's decedent in a position of peril on the crossing. The resulting collision was most assuredly the direct and proximate result of this negligence. There was ample evidence to submit both these issues to the jury under appropriate instructions.").

moves past the old Delaware Crossing before coming to a complete stop. *Id.*

Comparing the elapsed time from the TIR with the event recorder data, the event recorder suggests a movement of 1,903 feet from the impact to stopping over 56 seconds. *Id.* Comparing this distance to measurements taken from Google Earth, using visual references in the TIR video, the locomotive appears to come to a stop closer to 2,150 feet past the point of impact. *Id.* This reveals an apparent error in the calibration of the event recorder of approximately 12% in the speed and distance calculations recorded on the event recorder. *Id.* Using this approximate, but apparent error in the distance and as such in the locomotive speed, calculations quickly show that the approximate speed of the train at the time it approached the subject collision site was closer to forty-seven (47) m.p.h. *Id.* This is even further in excess of the maximum speed authorized by federal law.

Plaintiff's expert, Allen Haley, performed an analysis of the speed of the train and closure time for the subject train beginning 112 seconds before impact when, according to the Defendant's event recorder information, the train speed increased from forty (40) m.p.h. to forty-one (41) m.p.h. and continued through the time at 73 seconds before impact when the speed increases to forty-two (42) m.p.h. *Id.* Comparing the closing time on two scenarios, first, that the speed of the train was accurate as recorded on the event recorder and, second, using the speed that Mr. Haley believes the train was actually moving, forty-six (46) m.p.h. and forty-seven (47) m.p.h., respectively. *Id.* Under the first scenario, had the train been moving at forty (40) m.p.h. in compliance with federal law, the locomotive would have reached the point of impact in scenario one approximately 4 seconds later and, in scenario two, almost 19 seconds later. *Id.* Under either of these scenarios, had the Defendant's train not be violating the maximum speed limit set by federal law, there was more than sufficient time for Mrs. Cornwell's vehicle to have cleared the subject railroad track and the collision would not have occurred. *Id.*

Operation of Defendant's train in excess of the maximum authorized speed for trains on this track at this location was a proximate cause of this collision and resulting death of Mrs. Cornwell. *Id.* at ¶11. Defendant's violation of the maximum federal speed limit was a willful violation and demonstrates reckless indifference to the safety of the public who used or would use this crossing on the approach of this train and was life-threatening. *Id.*

The Plaintiff may properly pursue a claim against the Defendant for its violation of the federal speed limit law, which constitutes negligence per se.[9] Defendant seeks to absolve itself from any liability by arguing that although the train's event recorder demonstrates the train was being operated in excess of the maximum speed allowed for this train track, it was being operated within the variance permitted for train speedometers under 49 C.F.R. § 229.117, thus Plaintiff may not pursue a claim for excessive train speed. This federal regulation pertaining to "speed indicators" (sensitivity, accuracy, and calibration of train's speedometer) requires the train's speedometer to be accurate within +/- 3 miles per hour for actual speeds of 10 to 30 miles per hour and +/- 5 miles per hour for actual speeds above 30 miles per hour. 49 C.F.R. § 229.117(a). The "speed indicators" federal regulation, 49 C.F.R. § 229.117, is absolutely irrelevant to the question of whether or not the train was being operated in excess of the maximum speed limit established by the timetable speed limits set forth in 49 C.F.R. § 213.9. This "speed indicators" federal regulation does not authorize train operators to exceed the maximum timetable speed limit.

In ***Murrell v. Union Pacific R. Co.***, 544 F.Supp.2d 1138 (D. Or. 2008), a pedestrian was hit

---

[9]  *See, e.g.*, ***Boyd v. National R.R. Passenger Corp.***, 446 Mass. 540, 552-3, 845 N.E.2d 356, 367 (Mass. 2006) ("'(T)he plaintiff presented such evidence which, if believed, would suggest that (the train engineer) had been exceeding the federally prescribed speed limit at the time the train hit (decedent)", thus "the plaintiff has presented sufficient evidence to create a triable issue of material fact whether the defendants' conduct . . . in purportedly exceeding the federally prescribed maximum speed limit at the time of the accident constituted reckless conduct.")

by a train and killed.  The railroad argued that although the speed limit set by the state and its own internal rules for the area where the incident occurred was 35 m.p.h. and its event recorder showed its train to be traveling at 37.4 m.p.h. at the time of the incident, the train was being operated "well within the federal parameters, as set forth in 49 C.F.R. § 229.117(a)." *Id.* at 1143.  The Plaintiff argued, however, 49 C.F.R. § 229.117(a) simply sets forth calibration requirements for speed indicators and does not authorize train operators to exceed the maximum timetable speed limit.  The Court agreed with the Plaintiff: "Based on the plain language of the regulation, there is nothing to suggest that a train conductor would be allowed to maintain speeds in excess of the maximum timetable speed limit.  Section 229.117(b) simply implies that speed indicators should be fairly accurate since they should be tested after each departure." *Id.* at 1149.  The *Murrell* court, however, ultimately ruled that Plaintiff's excessive speed claim was preempted by federal law because "(f)ederal regulations, which specify speed limits for different types of tracks and trains, are not affected by internal railroad policies" and "(t)he U.S. Supreme Court in *Easterwood* verified that Part 213 of the code of federal regulations preempts local speed laws. 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993)."  The *Murrell* court also noted that "Plaintiff does not argue railroad defendants did not meet class three standards for passenger trains", thus "federal preemption is still applicable in this case." *Id.* at 1150.

"The question of whether the train was running at an excessive speed or whether the speed of the train constitutes negligence (is) a question fo fact to be determined by the jury." *St. Louis-San Francisco Ry. Co. v. Rundell*, 1925 OK 183, 108 Okla. 132, 235 P. 491, 494.[10]

---

[10] *See also*: *Midland Val. R. Co. v. Pettie*, 1945 OK 259, 196 Okla. 52, 162 P.2d 543, 545 ("Whether approaching a crossing at a rate of speed in excess of an ordinance with an obstructed view of the right of way and without sounding the bell or blowing the whistle constitute negligence which is the proximate cause of the injury are questions of fact properly submitted to the jury."); *Stewart v. South Kansas and Oklahoma R.R., Inc.*, 36 F.Supp.2d 919, 921 (D. Kan. 1999)

## DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT BASED UPON THE ALLEGED NEGLIGENCE OF RENIA CORNWELL

Defendant incorrectly argues that it is entitled to summary judgment in this case based upon the alleged "negligence per se" of Renia Cornwell for failing to stop at the railroad crossing. In order to reach its erroneous conclusion, the Defendant completely ignores Plaintiff's claim and supporting evidence that the train failed to properly sound its horn (whistle) as it approached the crossing where the collision occurred in violation of Oklahoma law and ignores the fact that Defendant negligently maintained an obstruction in the sight triangle, which obscured Mrs. Cornwell's ability to see the on-coming train. None of the cases cited by the Defendant involve a situation where the Defendant railroad failed to sound its horn (whistle) prior to entering the railroad crossing. None of the Defendant's cases involve the presence of an obstruction within the sight triangle which obscured a motorist's view of an on-coming train. None of the Defendant's cases involve a train that was being operated at speeds in excess of the maximum speeds permitted under federal law.

In moving for summary judgment, the Defendant ignores the constitutional and statutory mandate in the State of Oklahoma that the issue of contributory negligence, or comparative fault, is *always* a question for the jury to decide.[11] The issue of comparative negligence is therefore not

---

("Defendant has not shown that the submission of the speed issue on a negligence *per se* theory was improper. The evidence at trial was sufficient to permit a reasonable jury to find that the defendant violated § 213.9 and that the violation was a cause of plaintiff's damages. Moreover, the court concludes plaintiff was within the specific class of persons intended to be protected by this regulation.").

[11] Okla. Const. art. 23, § 6 ("The defense of contributory negligence or of assumption of the risk shall, in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury."); 23 O.S. § 12 ("The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact, and shall at all times be left to the jury, unless a jury is waived by the parties.").

amenable to the summary judgment process.[12]  The same is true on the question of negligence per se.[13]

Defendant's reliance upon *Hamilton v. Allen*, 1993 OK 46, 852 P.2d 697 is misplaced.  The train crossing in the *Hamilton* case was "protected by crossbucks, flashers, gates, and bells on both sides of the crossing."  852 P.2d at 698-9.  The Plaintiff approached the crossing, "stopped briefly, then crossed the center line, pulling into the approaching lane of traffic, and drove past the two cars and around the gates" and collided with the Santa Fe switch engine on the mainline.  *Id.*  "At the time of the accident, the flashers, which warned of an approaching train, were on and the gates blocking the lanes were down."  *Id.* at 699.  There is no such conduct in the present case and Defendant has presented no evidence that Mrs. Cornwell engaged in reckless and illegal conduct when she attempted to cross the railroad tracks.  There were no gates, flashing lights, or bells at the

---

[12] *F.D.I.C. v. Ferguson*, 982 F.2d 404, 407 (10th Cir. 1991) ("The determination of contributory negligence is then a question of fact for the jury. Okla. Const. art. 23, § 6; Okla.Stat.Ann. tit. 23, § 12".); *Chicago, R.I. & P.R. Co. v. Hugh Breeding, Inc.*, 247 F.2d 217, 226 (10th Cir. 1957) ("We conclude therefore, that there were issues of fact with respect to the Railroad Company's negligence and the contributory negligence of (Plaintiff) which required submission of the case to the jury."); *Continental Cas. Co. v. Shankel*, 88 F.2d 819, 824 (10th Cir. 1937) ("Under this provision (Okla. Const. art. 23, § 6) where primary negligence is established by the evidence, the issues of assumption of risk and of contributory negligence must be submitted to the jury and its finding thereon is conclusive."); *Graham v. Keuchel*, 1993 OK 6, 847 P.2d 342, 358 ("Oklahoma constitutional and statutory law provide that the defense of contributory negligence shall always be a question of fact and must be left to the jury in all cases."); *Public Service Co. of Oklahoma v. Fort Worth Grain Exchange*, 1998 OK 89, ¶¶ 8-9, 988 P.2d 323, 325 ("the trial court's summary judgment ... was therefore error" and deprived the party of "its opportunity to have a jury decide the issue" of contributory negligence, thus "(o)n remand the trial court is directed to submit issues of contributory negligence or assumption of the risk to a jury as questions of fact.").

[13] *Jones v. Oklahoma Natural Gas Co.*, 1994 OK 89, 894 P.2d 415, 420 ("A violation of the Act may, therefore, be negligence per se, but only if the violation proximately caused or contributed to the damages at issue. *Smith v. Cox*, 301 P.2d 649, 650-51 (Okla. 1956); *Boyles v. Oklahoma Natural Gas Company*, 619 P.2d 613, 618 (Okla. 1980).  The determination of what casual connection, if any, existed between either (Defendant's) or (Plaintiff's) violations of the Act, and whether those violations were negligence per se, is for the jury.").

subject crossing. There is no evidence to show that Mrs. Cornwell was intentionally disregarding any safety devices when she attempted to cross the tracks. The *Hamilton* Court also specifically quotes from *Missouri-Kansas-Texas Railroad Co. v. Baird*, 1962 OK 82, 372 P.2d 847, 849, in which the Court states:

> In recent years this Court has held on repeated occasions that a duty rests upon those operating a train to warn a traveler over a highway of its approach: that even though the traveler be at fault, the question of proximate cause is for the jury *where there is competent evidence showing that a warning was not given.*

This quote supports Plaintiff's position that where, as in the present case, no warning of the approaching train was given, which would have warned Mrs. Cornwell of the approaching train in enough time to avoid the collision, then a jury question is created as to whether or not the Defendant's breach of its duty to warn the traveling public of the train's presence caused, or contributed to cause this accident. Clearly, this question may not be resolved on summary judgment.

Defendant cites *Akin v. Missouri Pacific R.R.*, 1998 OK 102, 977 P.2d 1040 in support of its position. In *Akin*, the evidence demonstrated that "(t)he train was blowing its whistle as it approached the Adair crossing and its headlight was on"; there was "nothing obstructing the view" of Mr. Akin; "the flashing lights of the existing grade crossing warning device could be seen by a person approaching the crossing"; and the lights "were flashing as Mr. Akin approached the crossing." 977 P.2d at 1056. All of these factors led the *Akin* Court to conclude: "Mr. Akin's failure to stop at the crossing in the presence of discernible warnings was the supervening, and therefore, proximate cause of his death." *Id.* The *Akin* case does not apply in this *Cornwell* case because, as stated herein, Plaintiff has offered proof that the Defendant's train failed to sound its horn (whistle) prior to entering the subject crossing; there were no flashing lights or signals installed at this crossing; and there were no automatic gates at this crossing, thus there were no discernible warnings of the train's approach and Mrs. Cornwell's attempt to drive across the tracks was not a

-22-

negligent supervening cause of her death.

Defendant supports its negligence per se argument with *Jester v. St. Louis-San Francisco Ry. Co.*, 1965 OK 180, 413 P.2d 539 involved a sleeping passenger in a semi-tractor trailer which collided with a train at a railroad crossing.  The Plaintiff in *Jester* argued that the train should have stopped when it became clear that the driver of the semi-tractor trailer was not going to stop at the crossing, to which the Court stated that the train engineer had the right to assume that the approaching vehicle has not omitted ordinary precautions and would stop in time to avoid injury. 413 P.2d at 541-2.  The evidence in *Jester* also showed that "(t)he weather was clear and visibility such that the engineer observed the truck while more than a quarter mile from the crossing";  "the crossing, or place of accident, was visible some half or three-quarters of a mile in the direction from which the truck was approaching, and more than one-fourth mile from the direction the train was traveling"; "(t)he crossing was protected both by automatic lights and bells and no claim was made same were not functioning properly"; and "(t)here was no charge of primary negligence against defendant based upon excessive speed, failure of signals, or to keep a proper lookout ahead." 413 P.2d at 540-1.  This raises the inference that since the visibility was clear, the driver of the semi-tractor trailer could see plainly see the approach of the train, or knew of its presence, yet attempted to cross the tracks anyway.  Unlike the present case involving Mrs. Cornwell, in *Jester* there was no evidence presented that the train did not sound its horn prior to approaching the crossing and/or that the driver of the vehicle was unaware of the train's presence.  Unlike the *Jester* case, there were no bells or flashing lights at the crossing where the train collided with Mrs. Cornwell.  Unlike the *Jester* case, Plaintiff is asserting that Defendant's train was exceeding the maximum federal speed limit at the time of the collision.

## SUMMARY JUDGMENT IS INAPPROPRIATE IN THIS CASE

Summary Judgment is only appropriate when admitted or undisputed facts lead to only one conclusion, leaving no genuine issues of material fact to be decided by the jury. Fed.R.Civ.P. Rule 56(c). The United States Supreme Court states: "Rule 56 should be cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of facts between them. *Associated Press v. United States*, 326 U.S. 1, 6, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013 (1945). It is considered a "drastic" relief to be "applied with caution." *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir. 1973). The summary judgment procedure must never be used to deprive a litigant of a full trial of genuine fact issues. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). Summary judgment does not serve as a substitute for trial, nor can it be employed so as to require parties to litigate via affidavits.[14] The Court must be certain beyond a doubt that there are *no unresolved material fact issues* before granting a summary judgment. *Mitchell v. Pilgrim Holiness Church Corp.*, 210 F.2d 879, 881 (7th Cir.), *cert. denied*, 347 U.S. 1013 (1954).

Pleadings must be liberally construed in favor of the party opposing summary judgment. *Harman v. Diversified Medical Investments Corporation*, 488 F.2d 111, 113 (10th Cir. 1973) ("In reviewing such action by the district court, the pleadings and other documentary evidence are to be construed liberally and in favor of the party opposing such motions."). The courts must consider factual inferences tending to show triable issues in a light most favorable to the existence of such issues.[15] "On summary judgment the inferences to be drawn from the underlying facts . . . must be

---

[14] *Smoot v. Chicago, Rock Island and Pacific Railroad Company*, 378 F.2d 879, 883 (10th Cir. 1967) ("Under the rule no margin exists for the disposition of factual issues, and it does not serve as a substitute for a trial of the case nor require the parties to dispose of litigation through the use of affidavits.")

[15] *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte County*, 546 F.3d 1299, 1306 (10th Cir. 2008) (the Court must "examine the record and all reasonable inferences that might be drawn from

viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2505, 91 L.Ed.2d 202 (1986).

"Summary judgment should not be granted where different inferences can be drawn from conflicting affidavits and depositions." *Madison v. Deseret Livestock Co.*, 574 F.2d 1027, 1036 (10th Cir. 1978). Even when parties agree on basic facts, but differing inferences may be drawn therefrom, summary judgment should be denied. *Webb v. Allstate Life Ins. Co.*, 536 F.2d 336, 339 (10th Cir. 1976). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Warrior Tombigbee Transportation Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296-7 (11th Cir. 1983).

Accepting Plaintiff's evidence as true and disregarding all conflicting evidence presented by the Defendant, there clearly are disputed material facts in this case which preclude the entry of summary judgment. Furthermore, reasonable persons might reach different conclusions upon those facts which are not disputed, thus offering further support for the denial of summary judgment.

WHEREFORE, premises considered, Plaintiff prays this Honorable Court to deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

---

it in the light most favorable to the non-moving party."); *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 171 (10th Cir. 1974) ("In assessing motions for summary judgment, both trial and appellate courts must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues.").

__/s/ John M. Merritt_____
JOHN M. MERRITT - OBA #6146
MERRITT & ASSOCIATES, P.C.
P.O. BOX 1377
OKLAHOMA CITY, OKLAHOMA  73101
(405) 236-2222    FAX:  (405) 232-8630
E-mail: docket.clerk@merrittfirm.com
ATTORNEY FOR PLAINTIFF


## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2010, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the electronic records on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Tom L. Armstrong     tarmstrong@tulsacounsel.com, jyoung@tulsacounsel.com
Robert D. Hart         rhart@tulsacounsel.com, bferris@tulsacounsel.com,
                       jyoung@tulsacounsel.com, jramsay@tulsacounsel.com

ATTORNEYS FOR DEFENDANT, UNION PACIFIC RAILROAD COMPANY


_/s/ John M. Merritt_____
JOHN M. MERRITT - OBA #6146