IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

(1) DENNIS R. CORNWELL, Individually, )
and as Personal Representative )
of the Estate of RENIA A. CORNWELL, )
Deceased, )
)
      Plaintiff, )
)
v. )  CASE NO. 08-CV-638-JHP-TLW
)  JUDGE JAMES H. PAYNE
(1) UNION PACIFIC RAILROAD CO., )
a Delaware Corporation, )
)
      Defendant. )

## DECLARATION OF ALLEN W. HALEY, JR.

I, Allen W. Haley, Jr., of legal age and sound mind, do under oath offer the following statements which are true and accurate and are based upon my personal knowledge:

1. I have been employed by Plaintiff as a Railroad expert. My CV is attached hereto.

2. Over the course of my professional career, I have been involved in hundreds of railroad accident investigations working both for railroads and as a consultant. I have interviewed many witnesses to train accidents and reviewed many statements of witnesses to train accidents who claim to have heard train horns/whistles to sound

1

**EXHIBIT**
"3"

immediately prior to accidents when it was proven by event recorders aboard the trains and videos aboard the trains which recorded visually and by sound that the trains' horns/whistles did not sound. It is a common occurrence for witnesses to train accidents to believe they heard the train horns/whistles sound when they did not sound because they have heard the train horns/whistle's sound reliably on so many prior occasions that they instinctively believe the horns/whistles sounded on the occasion of the accidents when they did not so sound. Also, such witnesses may have heard the train's horn/whistle sound at a different crossing yet believed, in error, the horns/whistles sounded at the crossing where the accidents occurred. For the remainder of this Declaration, the word "whistle" will be used to mean the "horn/whistle".

3. I have viewed the videotape that was recorded by the video recorder that was on the locomotive of the train which was involved in the accident which is the subject matter of this lawsuit which collided with the vehicle driven by Plaintiff's decedent, Renia A. Cornwell. This videotape recorded both visually and in sound the movement of the subject train for a number of miles before it arrived at and at the time it arrived at the subject accident crossing. The vehicle driven by Mrs. Cornwell is shown on such videotape entering the crossing where the accident occurred. The crash between the train and the Cornwell vehicle can be heard on the sound portion of video. However, no whistle is heard on the sound portion of the video recording for the time period the train approached the subject crossing where the accident occurred. Further, no whistle can be

heard to have sounded on the sound portion of the video recording as the train approached a number of crossings prior to approaching the subject accident crossing.

4. I am familiar with locomotive horns substantially similar to the LESLIE RSL-3L-RF horn, which Defendant claims was on the subject locomotive. I am familiar with the data event recorders (trip recorders) which were on the UP8130 locomotive which is involved in the subject accident. Defendant claims that the data event recorder (trip recorder) on board the locomotive recorded that the locomotive's whistle had been sounding for 1,340 feet prior to subject crossing. If the locomotive's whistle had so sounded, it would clearly have been heard on the sound portion of the video recorded, especially since the crash can be heard on the sound portion of the video recording. As I am sure everyone knows, a train whistle can be heard for miles away from a train accident scene, but the sound of a crash cannot be heard for miles away. It is inconceivable to me that the crash could be heard on the sound portion of the video recording but the locomotive's whistle could not also be heard.

5. The Defendant's explanation that the noise caused by the train's wheels on the track and the sound of the wind and other sounds from the train traveling at 42 m.p.h. would mask the sound of the locomotive whistle is, in my experience, incredible. I have ridden on numerous trains which where substantially similar in composition and speed to the train that was involved in this accident and have personally experienced the audio levels of a locomotive whistle and background noise that are normally present in a

3

moving train. I have also listened to the sound portion of video recordings from locomotives and never, in my experience, have such a masking of the locomotive whistle occurred. The explanation for why the locomotive's event recorder recorded the train's whistle as sounding 1,340 feet prior to subject accident crossing is twofold:

(1) The engineer activated the locomotive's whistle, but due to a malfunction in the whistle, the whistle did not sound. The activation of the whistle would cause the event recorder to record the whistle's activation. An event recorder does not record the whistle sounding, but only records its activation. Though activated, a malfunction could have prevented the sounding of the whistle.

(2) When the data was downloaded from the event recorder to a computer, the data could have been manipulated by the computer operator before the data was printed to make it appear that the event recorder recorded an activation of the horn 1,340 feet prior to the subject accident crossing when in fact, there was no activation at such location. Similarly, any data that displays on a video downloaded from the video recording system or the accompanying audio soundtrack could be manipulated. If on the subject train run (or prior run) which resulted in the subject accident, there had been a malfunction in the train's whistle, it would have been advisable for the whistle to have been repaired somewhere during the train run. Under such circumstances, it has been my experience in the railroad industry that the appropriate repair orders and repair maintenance forms recording such maintenance or repairs in the middle of a train run are often not filled out,

4

or if they are, they are often not turned in to the railroad. This also often occurs even when such repairs or maintenance occurs at a railroad's yard. It should not happen, but it does, in fact, happen on more occasions than the railroad industry would like.

6. One of the so-called eye-witnesses, Karen Davis, was inside her house when she heard the whistle. She does not indicate that she heard the train/vehicle crash and therefore she would not have known whether the whistle had sounded several crossings away before the accident occurred or whether the whistle sounded after the accident occurred or whether the whistle sounded just prior to and at the time of the accident. It is my opinion that the other witness, Garrett Checkles, is simply mistaken as to when he heard the whistle sound, if he did in fact hear such whistle sound.

7. Plaintiff's counsel has advised me that Defendant claims that the whistle can be heard on the sound portion of the video recording. Try as I may, after reviewing the video multiple times, I can hear no horn or even the faintest sound of a horn on the video recording, but I can hear the accident crash. I have also been advised by Plaintiff's counsel that defense counsel has advised Plaintiff's counsel that there are no videos available of the subject locomotive sounding its whistle on other occasions because the video recorder is only downloaded when there is an accident that occurs and the video recorder records on a 45 minute loop so that whatever was recorded 45 minutes in the past is recorded over by the video recorder. Therefore, the only way to determine if the defense theory that the whistle is masked by the sound of the wheels, wind and other

5

sounds of the train at 42 m.p.h. would be to download the same video recorder while it is on the same locomotive involved in the accident where it is traveling at the same approximate speed (42 m.p.h.) while pulling approximately the same number railroad cars the train was pulling at the time of the subject accident (plus or minus 25%) and while the whistle is sounding. (This number of 25% more or less is not a magic number and could be adjusted if necessary.)

8. The recording of the train run and sounding of the locomotive's whistle could be accomplished by Defendant notifying Plaintiff's counsel of a date and time that the subject locomotive would begin a normally scheduled train run at any place in the United States of America when such train locomotive would be pulling plus or minus 25% of the number of railroad cars (or some other adjusted amount agreed upon) as the train was pulling at the time of the subject accident.

9. Immediately prior to the beginning of such train run, I or a person I designate, could board the train locomotive while stopped and inspect the tamper proof seal, required by federal law, which seals the event recorder and video recorder aboard the locomotive to be sure such systems are sealed. After it is determined that such seal is present, I or a person I designate would de-board the train.

10. The railroad would provide me with a time table for the specific run and the speed limits of the last 40 minutes of the run. I would select a geographic location designation during the last 40 minutes of the run where the engineer would be directed to

sound the whistle of the locomotive when the train is traveling at approximately 42 m.p.h. (plus or minus 5 m.p.h.). The train crew would then follow such instruction and I or my designate, would meet the train at its final stop on the run. A railroad employee who is authorized to break the seal of the event recorder and video tape recorder who has the equipment to download the video tape recorder would board the locomotive together with me or my designate and download the video tape recorder to a computer. This likely would take less than 30 minutes. A copy of this download would be immediately provided to me or my designate. At least one month prior to such run of such train, the railroad would provide me or Plaintiff's counsel with the necessary computer programs to be able to play such downloaded video recording or would certify what commercially available software programs can play the downloaded video so that I or my designate could review the recording on our computer before de-boarding the locomotive to insure that the video recording had been properly downloaded.

11. The above procedure or some similar procedure is the only way it can be determined whether the sound of the wind, the sound of the train rolling on the rails, the other noise caused by a moving train at approximately 42 m.p.h., can mask the sound of a locomotive's whistle as Defendants claim. If Plaintiff is not permitted to make such inspection under the procedures set out above or some similar set of procedures, the jury will have no way of knowing whether Defendant's claims are true or not. My experience has been that most people, including juries, would assume the Defendant knows what

sound it's video recorders were capable of recording and what sounds might mask other sounds, especially where such recording devices are not available to the public and are within the exclusive control of the railroad. As stated above, Defendant's claims are incredulous in my opinion. It would be impossible to demonstrate to juries that what the Defendant claims is untrue by sounding the horn on the locomotive while it was stopped with no wind, no sound of the train traveling over the tracks, no other sounds of the train while traveling at 42 m.p.h.

I declare, certify, verify and state under penalty of perjury that the foregoing is true and correct. Executed on this 6th day of October, 2009.

*[signature]*

ALLEN W. HALEY, JR.

303 NORTH FIRST STREET WEST, MARATHON, TEXAS 79842
PHONE (432) 386-4217 • FAX (281) 754-4800 • ahaley@sts-consultants.com

# ALLEN W. HALEY JR.

## SUMMARY OF QUALIFICATIONS

- A multi-talented manager experienced in rail transportation.
- Over 28 years experience in railroad operations, transportation consulting, track and equipment maintenance, management, labor relations and in working with regulatory agencies.
- Has developed training programs to train railroad employees working as train dispatchers, conductors, engineers, switchmen, track inspectors, track maintenance workers, and supervisors.
- Experienced railroad manager with a sound knowledge of C.F.R. 49 Part 200, Texas Railroad Commission Regulations, Hazardous Materials Regulations, General Code of Operating Rules, and railroad timetables.
- Skilled at accident and derailment investigation including inspection of track and equipment for compliance with federal regulations and in identifying defects with track or equipment with a causal tie to the accident.
- Executive level management experience including strategic planning, setting annual and capital budgets, training and development of managers and employees, developing and implementing cost controls and implementing revenue enhancement processes.
- Effective leader with excellent people skills at the employee, peer, and customer level. Substantial communication skills that enhance the ability to manage people effectively be it in negotiations, sales meetings or in a motivational presentation to a group of employees.
- A transportation professional capable of dealing with fast-paced or high-pressure projects which demand organizational skills, fostering team work, adherence to timetables, team results and attaining goals.
- Able to make solid decisions based on years of experience and an extensive knowledge of the transportation industry.
- Significant computer skills on most current office applications, databases, spreadsheets, web pages, and Internet applications.

# PROFESSIONAL EXPERIENCE

## 1973 – 1990 *Southern Pacific Railroad*

- Train Dispatcher
- Regional Transportation Manager – Locomotives
- Chief Train Dispatcher
- Assistant Regional Manager of Operations
- Regional Manager of Operations

- During his 17 years with the Southern Pacific, Allen served in numerous operations positions. In his various capacities in the transportation and operating department of the Southern Pacific, he provided analytical and planning support for Vice-Presidents, General Managers, and Superintendents in the management of the railroad.

## 1990 – 1996 *A C E Consultants*

- Principal and Consultant

- Analyzed proposed operating plans during rail mergers to determine their impact on the client's operations.
- Prepared verified statements and provided testimony on operating issues and operating plans in recent mergers.
- Studied dispatching procedures and practices for several carriers to assess the need for new protocols and procedures.
- Developed a course of training for new train and engine crews.
- Assisted a regional railroad in converting to the General Code of Operating Rules, including the development of a training program, preparing rulebooks, a new timetable and teaching rules classes.
- Conducted safety audits and operating practices testing for a regional carrier to assist in their efforts to improve their safety performance.
- Prepared an operating plan to be used before the Surface Transportation Board during a merger proceeding.

## 1996 – 2000   *The Texas Mexican Railway*

- ➢ Superintendent of Transportation
- ➢ General Manager

- Improved the safety record of the company to finish in first place for Class III railroads in the Harriman Safety Award for 1996.
- Continued emphasis on safety and training to complete 1997 in third place in the Harriman Safety Awards for Class III railroads.
- Improved the safety record of the company to finish in second place for Class III railroads in the Harriman Safety Award in 1998.
- Worked with the FRA to improve the Company's compliance record by increasing the levels of training and testing.
- Member of the team responsible for The Texas Mexican Railway Company being named the Regional Railroad of the Year for 1998.
- Worked with the FRA to implement the Safety Assurance & Compliance Program on the Tex-Mex. Represented the company as the senior management member on the oversight committee.
- Worked with the FRA to revise and improve the Locomotive Engineer Certification and Field Observation Testing programs.
- Assisted in the development of the plan to consolidate the operations of The Texas Mexican Railway Company with TFM and KCS.
- Directed the efforts of the Engineering and MW Department in the development of capital budgets. Lead the team who developed a sixty-five million dollar capital improvement plans for the railroad.
- Worked as company liaison with the city-planning agency to develop a comprehensive transportation plan and grade crossing consolidation plan for the city of Laredo, Texas.
- Senior member of the team who responded to accidents involving trains or employees. Responsible for investigating accidents to determine cause, instituting corrective actions, clearing derailment sites and coordinating with contractors, federal and state agencies.

## 2000 - Present    *Strategic Transportation Services*

➢ Principal & Senior Rail Consultant

- Developed railroad rules program and rail yard safety training program for a companies working in chemical plants.
- Assisted an economic development company in the study of rail car storage and storage in transit requirements.
- Assessed warehouse and logistical service demands in Texas for a client seeking locations for an expansion.
- Assessed border infrastructure and cross-border traffic patterns for another consulting company working as a subcontractor.
- Developed a rail safety training program for communications contractors working near railroad property.
- Provided railroad safety and roadway worker protection training services for companies.
- Provided litigation support and expert testimony on hazardous materials regulations.
- Part of a team involved in the evaluation of locomotive and signal repair costs as the result of a grade crossing accident.
- Conducted safety audits for a company providing switching services inside a major chemical plant.
- Provided expert testimony supporting a shippers claim to recover losses resulting from a rail carriers failure to provide consistent service levels.
- Conducted an accident investigation for a client to determine root causes of an accident involving a railcar.
- Provided litigation support and expert reports on grade crossing accidents.
- Investigated an accident (derailment) inside a chemical plant to determine the cause. Also conducted a re-enactment of the accident as a part of the investigation.
- Provided litigation support on track safety standards, maintenance and inspection practices for a case involving a train derailment on an industry owned track.
- Conducted a rail safety audit for an east coast company to identify operating and physical plant problems that were affecting safety performance and rail efficiency.
- Assisted a company in assessing repair costs claimed by a railroad as a result of an accident on railroad property.

## **EXTENDED TRANSPORTATION TRAINING**

- International Freight Forwarding, Harris County Community College
- Incident Investigation Training, Kansas City Southern Railroad
- Railroad Track Maintenance, University of Wisconsin – Madison, WI.
- Hazardous Materials Training, Bureau of Explosives, St. Louis, MO.
- OSHA Safety Training, HACSC – Pasadena, TX
- Hazardous Materials Refresher – FEMA / DOT, Houston, TX.
- FRA Track Safety Standards – ASLRRA / FRA, Corpus Christi, TX.
- Hazardous Materials Regs. – ASLRRA / FRA, Corpus Christi, TX.