IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) DENNIS R. CORNWELL, Individually, and as Personal Representative of the Estate of RENIA A. CORNWELL, Deceased,<br><br>     Plaintiff,<br>v.<br>(1) UNION PACIFIC RAILROAD CO., a Delaware Corporation,<br><br>     Defendant. | CASE NO. 08-CV-638-JHP-TLW<br>JUDGE JAMES H. PAYNE |

## DECLARATION OF ALLEN HALEY, JR.

1. My name is Allen Haley, Jr. and I have previously submitted an Affidavit in this action, which I understand was attached as Exhibit "1" to Plaintiff's Response to Defendant's Motion for Protective Order that was filed on October 6, 2009. A copy of my curriculum vitae is attached to my previously filed Affidavit.

2. It is my understanding that Defendant claims that I am not qualified to testify concerning the event recorder and video recorder on board locomotive UP 8130, citing a New Mexico federal district court case, Vigil v. Burlington Northern & Sante Fe. Ry. Co., 521 F.Supp.2d 1185 (D.N.M. 2007) in which, under the specific facts of that case, the Court prevented me from testifying in a manner that is substantially different than my testimony in this case. The district court did permit me to testify on other railroad matters as a railroad expert. In the Vigil case, there was no train video that had no whistle sound on it. My testimony in

1



EXHIBIT "4"

this case begins with the proposition that the sound of the video from locomotive UP 8130 did not contain a train whistle which would have been heard if such whistle had sounded. I then explain in my prior Affidavit various ways it could be possible that a train whistle (horn) would not sound, as evidenced by the lack of whistle (horn) sounds on the video from locomotive UP 8130, yet the event recorder indicate it did sound.

3. In the Vigil case before the Court made a ruling and issued its order, the attorneys who represented the Plaintiff and whom had sought the affidavit from me in support of their opposition to the motion offered NO demonstration of my qualifications or methodology other than to simply say "he is qualified because he has experience". The Plaintiff's Counsel made no attempt to show the Court where this experience came from, the extent of this experience, how it would be used to offer opinions, nor how this testimony would benefit or be of any use to the Trier of facts. Since this case, there has been at least one other case where a motion to strike my testimony has been heard by a Court related to event recorder data, this court denied the Defendant's motion and found me qualified to offer expert opinions pertaining to event recorder data. To the best of my knowledge other than in the Vigil case, no court, including one case in Federal Court, has limited or stricken my testimony on issues related to event recorders.

I have had practical training, consistent with the normal and traditional railroad training programs, in the downloading and reading of locomotive event recorder

2

data. I have additionally and further had the life experiences that allowed me to compare actual known locomotive operations against the data shown on that locomotive event recorder, which is more valuable and complete than any classroom training that can be provided by the companies who provide event recorder software. I additionally have had the experience that can not be gained through classroom training, to actually download locomotive event recorders, utilize the event recorder reader software to analyze the data and to interpret and use this interpretation in determining accident cause. My experiences in the actual and practical use of event recorders in the railroad industry far exceeds the basic training that is typically provided by event recorder suppliers to individual railroad employees or retained consultants. Additionally, since the ruling in the Vigil case, I have attended a formal training program at the University of Wisconsin, Madison, related to railroad operations which included a segment related to locomotives and locomotive event recorders.

During the investigation of accidents as a railroad employee, I frequently used data from locomotive event recorders to evaluate the statements of the crews involved in the accident and to reconstruct the events that preceded the accident. I have used information from locomotive event recorders to assist me in my investigation. I am familiar with the Federal Regulations pertaining to the requirements of event recorders on locomotives and I am familiar with their operations, their use and railroad practices and procedures relating to the downloading of and analysis of event recorder data.

As it pertains to this case, I will utilize information from discovery related to the authorized speed of the train involved in the accident of July 16, 2008, track chart information, railroad timetables, special instructions, track bulletins, general orders, eye-witness statements and information about the stopping location of locomotive UP 8130 to assess the locomotive engineers operation of the train. This will include handling of the throttle, use of the train brakes and sounding of the locomotive horn. My analysis will involve the correlation of these events as they relate to proximity to the crossing and to determine compliance with applicable railroad rules or Federal Regulations.

4. My factual experience, based upon my actual knowledge (not opinion), establishes that I have investigated numerous railroad accidents during my career as a railroad employee and for Plaintiffs and Defendants as an expert witness. I have analyzed data, witness statements and discovery documents which have shown that sometimes an event recorder will not show that a locomotive horn was sounded at a crossing, but fact witnesses have said that they heard the locomotive horn. My testimony on these issues will be based on this is factual information learned by me through my observations of the printouts from event recorders and review of witness statements and testimony. It is not speculative testimony, but is instead based on events that actually occurred. It demonstrates that witnesses who live or work near railroad crossings who daily and sometimes every few hours hear trains' whistles (horns) on a constant basis are conditioned to believe they heard the horn. I have found that oft times when

no whistle (horn) was sounded sufficiently in advance of a collision, the whistle (horn) is sounded at the collision or shortly thereafter. It is my experience that some witnesses may, after the fact, believe was sounded prior to the collision. All of this is factual information based upon my experience as a railroad employee involved in the investigation of railroad accidents at grade crossings and in my continued experience as an expert witness where I have had the opportunity to analyze the events preceding and following a collision by using the tools that are traditionally available to the railroad investigator, specifically the event recorder.

5. I have extensive experience with train whistle (horn) systems and understand how the train whistle (horn) activation systems feeds signals to the event recorders and to the trains' whistle (horn). Further I have relatively competent computer skills which permit me to understand data, when it is outputted from a computer and downloaded to a printer, DVD and/or CD ROM, can be captured and altered. I additionally have the experience of an expert witness who has reviewed numerous event recorder printouts and analyzed these printouts for anomalies indicative of data manipulation. It has been my experience, a fact that was confirmed by a Union Pacific employee responsible for event recorder analysis and interpretation that railroad can and do manipulate the data. It is very common to make changes to time, location and wheel circumference of event recorder download information. This can have significant

impacts on the analysis of this data affecting such things as train speed, distance traveled and proximity of events to the collision or accident.

6. I have extensive experience in investigating train accidents and dealing with event recorders and I have an in depth understanding as to how printouts are made from such event recorder data. Like most people, including the railroad experts who themselves use and analyze event recorder data, I may not have an in depth knowledge of the programming and proprietary algorithms of the event data recorder. Further, I have been around event recorders for decades and I understand how the activation of the train's whistle activation system transmits a signal to the event recorder. This is knowledge gained through train operation and knowledge of the how the whistle's signal is transmitted by the whistle activation system to the input to the event data recorder.

7. I am highly qualified through my years of railroad experience as a manager and a trainer on the rules and regulations related to the locomotive horn. I also have considerable knowledgeable and practical experience as to how the whistle can malfunction and not sound even though a signal is sent to the whistle by the whistle activation system.

8. Unlike, Mr. Fann, I will not attempt to offer opinions based on acoustical studies or to attempt to measure in any way the acoustical signature of the locomotive horn as compared to the overlying noise of two pieces of metal rubbing together creating vibrations. My experience and the basis that I will use

in my opinions related to the sounds heard, or not heard, on the TIR will instead be based on my experience working on the railroad and occupying the cab of numerous locomotives as they moved trains or cars around the railroad. The experiences that I rely upon are related to the sounds that are typically heard by the crew aboard a locomotive. Specifically, that the sounds of a properly tuned and compliant locomotive whistle can and is heard in the cab area of the locomotive and ahead of the locomotive. All of these in the area where the locomotive TIR microphone should be able to pick up the sounds. Additionally, in my analysis of the TIR audio and video, I am able to assist the Trier of facts in understanding other sounds that are recorded by the TIR. I will offer testimony based upon my experiences in locomotive cabs that will assist in an understanding of why a locomotive whistle should be heard on the audio portion of the TIR, if other sounds of lower db's are easily heard on the sound portion.

9. In this case there is no sound of the locomotive horn on the TIR audio recording. This is contrary to witness statements and also contrary to information that appears on the event recorder, these discrepancies and my knowledge of locomotive horns and railroad operations provide a basis for me to opine that at least one of the possibilities I set out in my Affidavit explains why the event recorder shows a whistle sounding and the video data stream recorded the sounding of the whistle does not corroborate the locomotive whistle. I take no position as to which of the possibilities actually explain why a whistle is recorded but did not sound.

10. The UP further objects to my Affidavit and contends that the requested inspection and "testing" of the locomotive TIR is burdensome on the railroad. I find it difficult to believe that this request creates the burden that the railroad is trying to imply. UP documents that were obtained from the UP's Web site, indicate that in January 2008, eighty-five percent of all of the UP's locomotives were equipped with the TIR. It further states that this number would continue to increase to ninth percent or more by the end of 2008. Additionally, we find out that the TIR's are capable of recording and storing up to five days of data, much more than the Plaintiff's were originally told. Considering the high percentage of TIR equipped locomotives on the UP and the numerous operations of grain trains on the UP into Mexico and to Gulf Coast grain shipping elevators, it is conceivable that at least weekly if not several times weekly a UP locomotive on a grain train is moving somewhere in the Southwest. As many of the lines to the Mexican border in Texas are lines belong to the UP and are also slower speed rail lines where speeds would approximate the 40 MPH of the train involved in the accident at question, it appears to be nothing more than logistics to select a train and designate it as the train that will have the TIR data extracted for the Plaintiff's. Additionally, with the five day storage period it would further allow the railroad to operate the train from a starting crew change point to the next stop for a crew change. At this point in time the data from the event recorder could be downloaded and the data on the TIR could be retrieved. This would eliminate the

necessity of the railroad stopping the train at a location other than where it is scheduled to stop.

I declare, certify, verify and state under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 13th day of November, 2009.

*Allen W. Haley, Jr.*

Allen Haley, Jr.